# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Yusuf Abiola Mosuro, M.D., :
                        Petitioner :
                                  :
              v. : No. 609 C.D. 2016
                                  : Submitted: August 26, 2016
Bureau of Professional and :
Occupational Affairs, State Board :
of Medicine, :
                       Respondent :

**BEFORE:**    **HONORABLE RENÉE COHN JUBELIRER,** Judge
                  **HONORABLE ANNE E. COVEY,** Judge
                  **HONORABLE JOSEPH M. COSGROVE,** Judge

<u>**OPINION NOT REPORTED**</u>

**MEMORANDUM OPINION**
**BY JUDGE COHN JUBELIRER**              **FILED: October 13, 2016**

Yusuf Abiola Mosuro, M.D., (Dr. Mosuro) petitions for review of a Final Order of the Bureau of Professional and Occupational Affairs, State Board of Medicine (Board) ordering a public reprimand be placed in Dr. Mosuro's permanent licensing record; imposing a $5000 civil penalty; and indefinitely suspending Dr. Mosuro's license to practice medicine and surgery in this Commonwealth. On appeal, Dr. Mosuro argues that the Board abused its discretion by suspending his medical license. Discerning no abuse of discretion, we affirm.

## I. BACKGROND

Dr. Mosuro, a resident of Texas, was issued a license to practice as a medical physician and surgeon in the Commonwealth on August 17, 1998. (Hr'g Examiner Adjudication, Findings of Fact (FOF) ¶ 2, R.R. at 223a.) Prior to the instant matter, Dr. Mosuro's license was current through December 31, 2016. (Id.) Dr. Mosuro is also licensed to practice medicine in other states, including Texas. (Id. ¶¶ 5, 9, R.R. at 223a-24a.) The conduct underlying the Board's Order relates to Dr. Mosuro's relationship with a pain management clinic in Texas owned by Latonica Fisher, an Advanced Practice Nurse (APN) acting under Dr. Mosuro's prescriptive delegation. (Id. ¶¶ 6, 10, R.R. at 223a-24a.) Pursuant to an agreement between Dr. Mosuro and Ms. Fisher, Ms. Fisher would compensate Dr. Mosuro with "a flat fee for each prescription he wrote for a clinic patient, and in turn, [Ms.] Fisher referred her patients to [Dr. Mosuro] for other treatment." (Id. ¶ 10, R.R. at 224a.) The Texas authorities initiated an investigation into the clinic, and Dr. Mosuro resigned upon learning of the investigation. (Id. ¶ 7, R.R. at 223a.)

On August 7, 2013, Dr. Mosuro and the Texas Medical Board (Texas board) entered into a consent agreement and order finding Dr. Mosuro

> to be in violation of the laws, rules, code, and/or regulations of the State of Texas because [he] failed to supervise his [APN] and allowed the APN to prescribe medications that were non-therapeutic while acting under his prescriptive delegation, failed to ensure that patient visits were adequately documented and prescriptions were supported by objective findings and data, and failed to ensure that recommendations to follow guidelines were implemented at the clinic.

(Id. ¶ 6, R.R. at 223a.)

The Texas board imposed the following discipline: (1) a public reprimand; (2) a civil penalty of $10,000; (3) a prohibition on "supervising physician

assistants, [APN]s or other midlevel providers except for a certified registered nurse anesthetist (CRNA) in an interventional or surgical procedure conducted in an institutional setting;" (4) a prohibition on "ordering, prescribing, or dispensing scheduled drugs except while providing anesthesia services in an institutional setting"; (5) a requirement that Dr. Mosuro pass the Texas Medical Examination with a score of 75 or above within one year; and (6) a requirement that Dr. Mosuro complete 16 hours of certain continuing medical education credits within one year. (FOF ¶ 8, R.R. at 224a.) The licensing authorities of Maryland, Tennessee, Alabama, and Virginia subsequently imposed discipline based on the Texas Order. (FOF ¶ 9, R.R. at 224a.)

On June 18, 2014, the Commonwealth, through the Department of State, issued a Notice and Order to Show Cause alleging that Dr. Mosuro facilitated the operation of an illegal pain management clinic for which he was subject to discipline in Texas. (Order to Show Cause, R.R. at 2a-4a.) The Order to Show Cause alleged that due to the Texas board's action, the Board could take action against Dr. Mosuro's license pursuant to Section 41(4) of the Medical Practice Act of 1985.[1] Dr. Mosuro filed an Answer and New Matter responding to the Order to

---

[1] Act of December 20, 1985, P.L. 457, as amended, 63 P.S. § 422.41(4). Section 41(4) of the Medical Practice Act of 1985 provides:

> Having a license or other authorization to practice the profession revoked or suspended or having other disciplinary action taken, or an application for a license or other authorization refused, revoked or suspended by a proper licensing authority of another state, territory, possession or country, or a branch of the Federal Government.

Id.

Show Cause on November 25, 2014, denying material allegations and demanding a hearing. (R.R. at 26a-30a.)

A hearing was held before a Hearing Examiner on May 20, 2015. Dr. Mosuro testified to his relationship with the clinic, the conduct underlying the Texas disciplinary action, and his compliance with the Texas board's discipline. Dr. Mosuro did not dispute the fact that he was disciplined in Texas or the Commonwealth's authority to sanction his Pennsylvania license. (Hr'g Tr. at 25, R.R. at 78a.) He requested the Hearing Examiner "fashion a penalty which takes into account the steps that Dr. Mosuro has taken to resolve the issues in Texas and the scope and nature of the violations." (Id. at 78-79, R.R. at 131a-32a.) Specifically he requested "an order mirroring" the Texas restrictions, and that such restrictions would "be removed on notice of full compliance with the Texas Order." (Id. at 79, R.R. at 132a.) The Commonwealth recommended a sanction of a "public reprimand and that [Dr. Mosuro]'s license be placed on an indefinite period of probation of no less than two years and remain on probation unless and until [Dr. Mosuro] can show that his license is in full unrestricted status in Texas." (Id. at 80, R.R. at 133a.)

The Hearing Examiner issued an adjudication and order on August 14, 2015. Therein, the Hearing Examiner concluded that Dr. Mosuro was subject to discipline pursuant to Section 41(4) of the Medical Practice Act of 1985. (Hr'g Examiner Adjudication at 10, R.R. at 230a.) The Hearing Examiner rejected both Dr. Mosuro's sanction request and the Commonwealth's recommendation, and instead elected to impose a $500 civil penalty and indefinitely suspend Dr. Mosuro's license. (Id. at 13-14, R.R. at 233a-34a.)

4

Dr. Mosuro sought review from the Board. Upon review, the Board adopted the Hearing Examiner's Findings of Facts and Conclusions of Law in their entirety. (Board Op. at 2.) The Board found that the Hearing Examiner's discussion on sanctions was not supported by the evidence or law and substituted the following. (Id.)

> Respondent was involved with improper prescribing of controlled dangerous substances through his involvement with a "pill mill" and his failure to properly supervise a nurse practitioner as required by Texas law. More specifically, the Texas board found standard of care violations, documentation/medical records violations and unprofessional conduct by Respondent. These violations are very serious. The sanction, imposed by the Texas board . . . are comprehensive restrictions which evidence the seriousness of Respondent's misconduct.
>
> On the other hand, the Texas board did not revoke Respondent's license, and thus must have found his practice could be remediated. By way of mitigation, the Texas board found that Respondent sought legal advice regarding registering the clinic as a pain clinic, gave the nurse instructions (but did not follow through to see they were implemented), and cooperated with the Texas investigators. The Commonwealth did not introduce evidence to show significant violations of the conditions of his Texas probation since summer 2013 when the restrictions were imposed.
>
> The Commonwealth recommended that Respondent receive a public reprimand and that he be placed on probation for at least [two] years and until his Texas license is fully restored. In his Application for Review, the Respondent proposes that the Board enter an order that mirrors the restrictions imposed by the Texas board. The Texas order requires Respondent to remain in Texas or have the order stayed pending his return.
>
> The Board finds that the sanction recommended by the Commonwealth is too lenient and does not provide the citizens of the Commonwealth with adequate protection because it would allow Respondent to practice in the Commonwealth without restrictions while his home state board determined that restrictions were required

5

for public safety. The Respondent's proposal that the Board mirror the Texas board would offer the citizens of this Commonwealth greater protection. However, because Respondent's misconduct occurred in Texas, the Board believes that the Texas board is in the best position to determine when Respondent is capable of returning to unrestricted practice. In addition, the Board does not believe that imposing the full $10,000 penalty is necessary to deter Respondent and others from similar misconduct. Accordingly, the Board believes that Respondent, who has not held an active license in this Commonwealth since December 2014, should continue his monitored practice in Texas until that board determines that he is safe to resume unrestricted practice.

(Board Op. at 3-4.)

The Board ordered a public reprimand be placed in Dr. Mosuro's permanent licensing record, a civil penalty of $5000, and an indefinite suspension of Dr. Mosuro's license to practice medicine and surgery in this Commonwealth. (Board's Final Order.) The Final Order further states that Dr. Mosuro "may petition for reinstatement when he can demonstrate that he has fully complied with the Texas board order and that his Texas medical license has been restored to unrestricted status." (Id.) Dr. Mosuro now petitions this Court for review of the Board's Final Order.[2]

## II.    DISCUSSION

This case is before us at a time when the Commonwealth, and the nation, is struggling to confront a crisis of prescription drug abuse. The Pennsylvania House of Representatives recently declared that the "proliferation of opioid prescription

---

[2] Our review of the Board's decision "is limited to determining whether the findings of fact are supported by substantial evidence and whether the board committed errors of law or constitutional violations." Blair v. Bureau of Prof'l & Occupational Affairs, State Bd. of Nursing, 72 A.3d 742, 750 (Pa. Cmwlth. 2013).

drug abuse has become a crisis" and that "[t]he human suffering associated with addiction for affected families has now reached epidemic proportions." House Res. No. 659 (2014). Statistics produced by the federal government reflect this growing crisis. According to the statistics from the Centers for Disease Control (CDC) of the United States Department of Health and Human Services, physicians wrote over 259 million prescriptions for opioid pain relievers in 2012, enough for one bottle of pills for every adult in the United States. Deborah Dowell, et al. CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016 1 (2016). The impact of this rise in availability is staggering. According to the Drug Enforcement Administration (DEA) of the United States Department of Justice:

> The threat from [controlled prescription drug (CPD)] abuse is persistent and deaths involving CPDs outnumber those involving heroin and cocaine combined. The economic cost of nonmedical use of prescription opioids alone in the United States totals more than $53 billion annually. . . . The number of drug overdose deaths, particularly from CPDs, has grown exponentially in the past decade and *has surpassed motor vehicle crashes as the leading cause of injury death in the United States.*

Drug Enforcement Admin. 2014 Nat'l. Drug Threat Assessment Summary 1 (2014) (emphasis added). The DEA attributes the rise in the availability of illicit pharmaceuticals in the United States to, *inter alia*, "[r]ogue pain management clinics (commonly referred to as pill mills)." Id. Pennsylvania ranks seventh in the nation for drug overdoses from prescription pain killers. Joint State Gov't. Comm'n of the General Assembly of Pa., Report of the Task Force and Advisory Comm. on Opioid Prescription Drug Proliferation 4 (2015).

We cite these lamentable statistics and the role of "pill mills" not as evidence in this case, but only to note the context in which the Board took the

action under review. The purpose of the Medical Practice Act of 1985 is to "safeguard the public health and welfare." Tandon v. State Bd. of Medicine, 705 A.2d 1338, 1345 (Pa. Cmwlth. 1997) (quoting Johnston v. Bd. of Medical Educ. and Licensure, 410 A.2d 103, 105 (Pa. Cmwlth. 1980) (addressing the Medical Practice Act of 1974[3])). We cannot ignore current threats to public health and welfare when assessing whether the Board carried out its statutory mandate in "a purely arbitrary and capricious manner." Blair v. Bureau of Prof'l & Occupational Affairs, State Bd. of Nursing, 72 A.3d 742, 750 (Pa. Cmwlth. 2013).

Dr. Mosuro argues to this Court that the Board's decision to indefinitely suspend his "license does not further public safety and welfare and is therefore an arbitrary action by the [Board] that goes beyond the necessities of the case." (Dr. Mosuro's Br. at 13.) Citing Ake v. Bureau of Professional and Occupational Affairs, State Board of Accountancy, 974 A.2d 514 (Pa. Cmwlth. 2009), Dr. Mosuro contends that this Court may review the Board's Order for a determination of whether the penalty is reasonable. Dr. Mosuro further argues that by suspending his license, the Board deprived him of his constitutional right to practice his long time occupation.

Appellate review of the Board's disciplinary sanction is limited, unless the Board is accused of bad faith or fraud, "to determining whether the [B]oard flagrantly abused its discretion or executed its duties or functions in a purely arbitrary and capricious manner." Blair, 72 A.3d at 750. Dr. Mosuro does not allege fraud or bad faith. In conducting our review, we do not "inquire into the wisdom of the [Board]'s action," as judicial discretion cannot displace

---

[3] Act of July 20, 1974, P.L. 551, 63 P.S. §§ 421.1 – 421.18. Repealed by Section 48 of the Act of December 20, 1985, P.L. 457.

8

administrative discretion. <u>Slawek v. State Bd. of Med. Educ. & Licensure</u>, 586 A.2d 362, 365 (Pa. 1991) (citing <u>Blumenschein v. Hous. Auth. of the City of Pittsburgh</u>, 109 A.2d 331, 334-35 (Pa. 1954)). It is not the role of a "reviewing court to substitute its judgment of what is reasonable for that of the agency whose decision is being reviewed." <u>Id.</u> at 366.

Here, the Board examined the seriousness of Dr. Mosuro's violation and his mitigation efforts, weighed the benefits of various disciplinary options, and determined that suspending Dr. Mosuro's license so that he cannot practice medicine at all in the Commonwealth until his license is reinstated without restriction in Texas best protects the citizens of this Commonwealth. The Board noted that Dr. Mosuro is being monitored by the Texas board, which imposed comprehensive sanctions, and that it is the Texas board that is in the best position to determine when Dr. Mosuro is capable of returning to unrestricted medical practice.

The Board did not abuse its discretion by taking strong action to protect the safety and welfare of citizens by suspending Dr. Mosuro's license instead of imposing conditions on his license similar to those imposed by the Texas board. Dr. Mosuro's violation is very serious. He "allowed his APN to prescribe medications that were non-therapeutic and failed to adequately supervise the APN acting under his prescriptive delegation." (Hr'g Examiner Adjudication at 9, R.R. at 229a.) It was only after the Texas authorities began its investigation that Dr. Mosuro severed his relationship with the clinic. (<u>Id.</u> ¶ 7, R.R. at 223a.) Even if we disagreed with the severity of the sanction and thought the Texas board's decision was more appropriate, the sanction was not capricious and must be upheld. <u>Slawek</u>, 586 A.2d at 365 (holding that the proper review is "*not* whether its order

9

was reasonable, but whether it was made in 'accordance with law' (i.e., whether it was made in bad faith, and whether it was fraudulent or capricious" (emphasis in original).)

We find Dr. Mosuro's citation to Ake as grounds for reversal unpersuasive. In that case, the State Board of Accountancy initiated an enforcement action against a petitioner convicted of criminal harassment in Illinois. Ake, 974 A.2d at 515. At the hearing on the matter, the petitioner admitted the conviction, but argued that his conduct was unrelated to his position as an accountant. Id. at 517. The petitioner explained that the conduct underlying his conviction related to him expressing his firmly held religious beliefs about homosexuality to a person who evicted him, who was a homosexual. Id. The petitioner admitted that the manner in which he expressed those beliefs was unlawful and wrong. Id. The board was not persuaded by the petitioner's mitigating evidence and revoked petitioner's license. Id. at 518. We reversed on appeal. We reasoned that we are "'required to correct abuses of discretion in manner or degree of penalties imposed'" and that "the nature of the offending conduct and its remoteness in time must be considered where an agency seeks to revoke a professional license on the basis of a conviction." Id. at 519-20 (citations omitted). We held that while the "Board had grounds to impose a sanction upon [the petitioner] . . . , the [b]oard abused its discretion by imposing the most drastic available sanction. Complete revocation of a [certified public accountant's (CPA)] credentials should be a sanction reserved for the worst offenders." Id. at 522.

Unlike Ake, where the petitioner's license was *revoked* for a criminal conviction *unrelated* to his position as a CPA, Dr. Mosuro's license was *suspended*, not revoked, and the conduct for which Dr. Mosuro's license was

10

suspended relates directly to Dr. Mosuro's fitness to practice medicine in the Commonwealth. Dr. Mosuro's conduct enabled Ms. Fisher to operate a "pill mill." His failure to adequately supervise the activities of the clinic reflects an indifference to the wellness of patients under his charge, and we see no abuse of discretion in the Board indefinitely suspending Dr. Mosuro's license.

Dr. Mosuro next argues that the Board's action infringed upon his constitutional right to pursue his long time occupation. He contends that the Board's decision "has interfered with [his] employment in Texas" and could lead employers to either terminate his employment or refuse to hire him. (Dr. Mosuro's Br. at 9.) Without active employment, Dr. Mosuro argues, it will be difficult for him to comply with the Texas board's order and have his license reinstated. For its part, the Board contends that this issue is waived as it was not raised to the Board below.

Even assuming, *arguendo*, that the issue was not waived, we see no constitutional violation in the Board's action. In Tandon, we addressed the suspension of a doctor's medical license pursuant to Section 41(4) of the Medical Practice Act of 1985 based on an out-of-state suspension. We recognized in that case that every citizen has a right "to follow any lawful calling, business[,] or profession he may choose." Tandon, 705 A.2d at 1347 (quoting Dent v. West Virginia, 129 U.S. 114, 121 (1889)). However,

> there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the [S]tate for the protection of society. The power of the [S]tate to provide for the general welfare of its people authorizes it to prescribe all such regulations as[,] in its judgment[,] will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud.

11

<u>Id.</u> (quoting <u>Dent</u>, 129 U.S. at 122.) We also recognized that it is a vital part of a state's police power "to establish and enforce standards of conduct within its borders relative to the health of everyone there." <u>Id.</u> at 1348 (quoting <u>Barsky v. Bd. of Regents of Univ. of State of New York</u>, 347 U.S. 442, 449 (1954)).

All occupational license suspensions necessarily lead to some restriction on the licensee's right to pursue a legal occupation of his or her choosing and impacts a licensee's employment prospects. A holding that the Board violated Dr. Mosuro's rights by imposing a sanction upon Dr. Mosuro, authorized by law, because the sanction interferes with his employment and could lead employers to not hire him would undermine the entire state licensing regime. The Board has the authority to suspend Dr. Mosuro's license so long as doing so is in the interest of the health and welfare of the citizenry, and the process is conducted pursuant to due process. It is Dr. Mosuro's conduct, not the Board's action, that put his medical practice and economic future in jeopardy.

We, therefore, see no abuse of discretion and affirm the Board's Final Order.

_____
**RENÉE COHN JUBELIRER,** Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Yusuf Abiola Mosuro, M.D., :
       Petitioner :
            :
      v. : No. 609 C.D. 2016
            :
Bureau of Professional and :
Occupational Affairs, State Board :
of Medicine, :
       Respondent :

## O R D E R

  **NOW**, October 13, 2016, the Final Order of the Bureau of Professional and Occupational Affairs, State Board of Medicine, entered in the above-captioned matter, is hereby **AFFIRMED**.

              _____
              **RENÉE COHN JUBELIRER,** Judge